**In re George Britton SMITH.**

**No. 75–2643A.**

United States District Court,
N. D. Georgia,
Atlanta Division.

March 29, 1977.

John C. Pennington, Stone & Pennington, Atlanta, Ga., R. Keegan Federal, Jr., Orr & Federal, Decatur, Ga., for bankrupt.

Morton P. Levine, Levine, DA'Alessio & Cohn, P. A., Atlanta, Ga., for trustee.

## ORDER

RICHARD C. FREEMAN, District Judge.

This is an appeal from an order of the bankruptcy judge in a proceeding originally brought pursuant to Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701, *et seq.*, in which the bankruptcy judge determined that the obligations of the bankrupt arising under a "Final Judgment and Decree of Divorce" were obligations for the support and maintenance of the bankrupt's former wife and were, therefore, nondischargeable under § 17(a)(7) of the Bankruptcy Act, 11 U.S.C. § 35(a)(7). Before turning to the merits of the instant appeal brought by the

bankrupt, a brief review of the salient facts is warranted.

On November 16, 1973, after more than sixteen years of marriage appellant-bankrupt and Mrs. Smith were divorced. Prior to their divorce, appellant and Mrs. Smith had entered into an "Agreement", which was incorporated into the final decree of divorce. In the agreement, the parties expressly recited that "they [were] desirous of settling their property rights, alimony, maintenance, division of property, custody of and support for the children and attorney's fees for an attorney representing the wife." Pursuant to the terms of the agreement, appellant conveyed to Mrs. Smith his interest in their Atlanta residence and certain ocean-front property located in Hilton Head, South Carolina, the household goods and furnishings, and a 1972 Buick Skylark. The conveyance of both parcels of real estate was subject to existing first mortgages, which Mrs. Smith assumed under the terms of the decree.

Paragraph 2 of the agreement further provided that appellant was to make certain periodic cash payments to Mrs. Smith, including, in paragraph 2(a), the obligation of the appellant to pay $25,000 in cash to Mrs. Smith in six installments over a two-year period. Paragraph 2(b) provided for a lump sum payment of $205,000.00 to be paid in 108 equal monthly installments of $1,900.00 until the lump sum was paid; however, the appellant was given the right to commute any and all unpaid payments to their present cash value and to satisfy the entire obligation at any time during the nine-year period. The installment payments in paragraph 2(b) were expressly denominated as "installment payments of a lump sum" and

the agreement further provided that such payments were "absolutely due and payable", and that "it was the intent of the parties that "said installments shall not be included in Wife's gross income for federal income tax purposes." Paragraph 2(c) provided for installment payments of $500 per month per child for child support until the children reach the age of eighteen or cease living with their mother.

Paragraph 2(g) was expressly designated as relating to "alimony" payments and provided that appellant would pay $100 per month in periodic installments of alimony. Such alimony payments were to automatically increase by $1,900.00 on the 109th month from the date of the agreement (i. e. after the term in which the $1,900.00 periodic installments required by subparagraph (b) were completed) whether the latter payments had been commuted or not. The payments in paragraph 2(g) were expressly made contingent upon death of the spouse, remarriage, or cohabitation with another man on any sustained basis, whether pursuant to a valid marriage or not.

In other portions of the agreement, the appellant was required to maintain life insurance with benefits payable to his former wife in an amount equal to the unpaid installments due under subparagraph (b), and further that in the event of his death prior to the termination of the installments, such benefits were to be paid in full.

All the installment obligations, with the exception of paragraph 2(b) were subject to modification under the Georgia law providing for modification of permanent alimony, see Ga. Code Ann. §§ 30–220, 222, whereas subparagraph (b) was not subject to modification on account of any contingency.[1]

---

1. The agreement *sub judice* provides, in pertinent part:

. . . In view of their intention to live apart the rest of their lives, *they are desirous of settling their property rights, alimony, maintenance, division of property,* custody of and support for the children and attorney's fees for an attorney representing the Wife. . . .

*To provide alimony, property settlement, support of* Wife and Children, Husband shall pay and convey to Wife the following:

(a) $25,000 in cash payable as follows: $2,083.33 on execution of this agreement; $2,083.33 on February 1, 1974; $2,083.33 on May 1, 1974; $6,250.00 on November 1, 1974; $6,250.00 on May 1, 1975; and $6,250.00 on November 1, 1975. All payments under this subparagraph shall be without interest.

(b) A lump sum payment of $205,200.00, payable without interest, in one hundred eight (108) equal monthly installments of $1,900.00 each, with the first installment being due on the first day of November, 1973 (Wife acknowl-

edges receipt of $1,000.00 deposited to her account on October 29, 1973), and in equal monthly installments on the first day of each month thereafter until said lump sum is paid. Provided, however, Husband shall have the right in his discretion to satisfy all unpaid installments under this subparagraph by commuting the unpaid installments to the present cash value thereof as of the date said election to commute is made. Said present cash value shall be commuted using an interest rate (compounded) of seven (7%) per cent per annum. The monthly installments provided for in this paragraph shall be absolutely due and payable at all events, and are hereby denominated as installment payments of said lump sum, with the express intent that said installments shall not be included in Wife's gross income for federal income tax purposes.

(c) Husband shall pay to Wife as child support for the support and maintenance of each of said Children the sum of $500 per month per child or a total of $1,000 per month for both Children. Said payments for each child shall commence on the first day of November, 1973 and will be paid on the first day of each month thereafter until the respective child dies, marries, becomes self-supporting or reaches the age of eighteen (18) years, or until said payments are terminated under subparagraph (d) hereof.

(d) Should either of said Children elect to live with Husband, or otherwise change his or her residence from that of Wife, Husband's obligation for child support of said child under subparagraph (c) shall terminate six (6) months from the date said child came to live with Husband or from the date of this Agreement if said Child is presently residing with the Husband and continues to do so for six (6) months.

(e) For income tax purposes, the Children shall be considered and returned as dependents of Husband not of Wife for the calendar year of 1973 and thereafter so long as Husband meets the obligations set forth in this Agreement.

(g) Husband shall pay to Wife the sum of $100.00 per month as alimony for so long as Wife is in life and unmarried following her divorce (if any) from Husband. Additionally, provided Wife is in life and has not remarried following her divorce (if any) from Husband, Husband shall pay to Wife as alimony the sum of $1,900.00 per month commencing with the first day of the calendar month following the date on which the last installment is due under subparagraph (b) of this paragraph. Said alimony payments shall begin on said date whether or not Husband has exercised his option to commute the lump sum in said subparagraph (b) to a present cash value and shall have paid the same prior to the date said last installment thereof was payable. Payments of alimony under this subparagraph shall continue from the date they are started until Wife shall die or remarry following her divorce (if any) from Husband, whichever shall first occur. Provid-

ed, however, no obligation shall accrue to Wife under this subparagraph, and if same shall have already accrued the same shall terminate, should Wife live with any person of the opposite sex on any sustained basis whether or not she may be married to said person. . . .

8.

Husband shall maintain life insurance on his life with death benefits payable to Wife as beneficiary in an amount equal to the unpaid installments due Wife under subparagraph (b) of Paragraph 2 of this Agreement. In the event of Husband's death prior to payment of all installments due under said subparagraph (b) (or the commuted value thereof if he prior to death elects to commute same as provided therein), said death benefits shall be paid to Wife in an amount sufficient to pay all unpaid installments under said subparagraph. For purposes of this subparagraph the unpaid installments shall be paid in full without commutation to the present cash value at the time of Husband's death. Wife's interest in the proceeds of said insurance policies shall be a security interest only and only to the extent of the unpaid installments under said subparagraph (b). Should Husband elect to do so, he may designate said insurance proceeds to a trust, but in the event a trust does receive such benefits, the trust agreement shall specifically require that the proceeds be used as provided in this subparagraph. Until or unless said trust is created, Wife shall be named as beneficiary to the extent of her interest as stated herein, and any excess of death benefits under said policy shall be paid as designated by Husband in said policy. Husband warrants that the premiums will be paid by him for said insurance promptly as they come due and that he will from time to time upon reasonable request of Wife furnish evidence that such insurance remains in force.

Husband shall, in addition to his obligations set forth elsewhere in this Agreement, provide medical, hospital and major medical insurance for each of said Children for so long as each Child is under the age of eighteen (18) and unmarried. . . .

13.

Notwithstanding any of the foregoing provisions of this Agreement, this Agreement and any alimony judgment rendered between the parties, *excepting the provisions of subparagraph (b) of Paragraph 2 of this Agreement, shall be subject to modification,* under the provisions of the Act approved March 9, 1955, providing for modification of permanent alimony, as set forth in Georgia Laws 1955, Page 630. Subparagraph (b) of Paragraph 2 of this Agreement and the relative provisions of any judgment shall not be subject to modification on account of any contingency and the parties hereby waive any rights of modification with respect thereto. . . .

(Emphasis supplied).

Appellee herein filed a petition before the bankruptcy court seeking a determination that the payments contemplated by paragraph 2 of the instant divorce decree were nondischargeable by reason of section 17(a)(7) of the Act, which provides in pertinent part that:

> A discharge in bankruptcy shall release a bankrupt from all of his provable debts, . . ., except such as . . . are for alimony due or to become due, or for maintenance or support of wife or child . . .

11 U.S.C. § 35(a)(7).

Following an evidentiary hearing on the question of dischargeability, the bankruptcy judge determined that the obligations encompassed by subsections (a), (b) and (g) were nondischargeable by reason of § 17(a)(7) since they were in essence payments for support, maintenance or alimony and were not in the nature of a property settlement dischargeable in bankruptcy. In reaching that conclusion, the court considered the facts and circumstances surrounding the execution, the testimony of the attorney who represented Mrs. Smith in connection with the divorce proceedings as well as the testimony of the appellant and Mrs. Smith. While appellant's grounds for appeal number seven, it is clear that the gravamen of the appeal is the bankruptcy judge's finding of fact and conclusion of law that the payments were in effect support payments and, therefore, not dischargeable in bankruptcy. The appellant challenges, particularly, the bankruptcy judge's admission of evidence outside the four corners of what appellant contends is an unambiguous document.

■ Unbroken judicial precedent establishes that § 17(a)(7) of the Bankruptcy Act exempts from discharge those debts that are founded upon the husband's continuing legal and moral obligation to support and maintain his wife and children. See, e. g., Wetmore v. Markoe, 196 U.S. 68, 25 S.Ct. 172, 49 L.Ed. 390 (1904); Jones v. Tyson, 518 F.2d 678 (9th Cir. 1975); In re Cox, 543 F.2d 1277, 1279 (10th Cir. 1977); Norris v. Norris, 324 F.2d 826, 828 (9th Cir. 1963).

Thus, courts have been admonished not to presume that Congress intended as a part of its design in enacting the Bankruptcy Act that by relieving the unfortunate debtor, bankruptcy also absolves the husband of his moral and legal obligations of maintenance and support. Dunbar v. Dunbar, 190 U.S. 340, 23 S.Ct. 757, 47 L.Ed. 1084 (1902); Poolman v. Poolman, 289 F.2d 332 (8th Cir. 1961). See also Goggans v. Osborn, 237 F.2d 186, 189 (9th Cir. 1956). In sum, courts should be reluctant to give effect to mere formal attributes of the agreement and avoid working a hardship "especially where [the] rights and responsibilities with respect to the family relationship are [concerned]." Erickson v. Beardall, 20 Utah 2d 287, 437 P.2d 210, (1968).

■ "Alimony" is usually defined as an allowance of money required to be paid by a former husband to his divorced wife for support and maintenance. See Ga. Code Ann. § 30–201. In contrast, a property settlement agreement deals essentially with a division of property belonging to the husband and wife, and it is well settled that the wife may, for a consideration, settle her claims against her husband's property by private agreement, and waive all claims for support, maintenance, or alimony. Goggans v. Osborn, supra, 237 F.2d at 188; In re Alcorn, 162 F.Supp. 206 (N.D.Cal.1958). Smalley v. Smalley, 176 Cal.App.2d 374, 1 Cal.Rptr. 440 (1959). After a property settlement, the rights of the parties must be determined according to the law of contract and may survive the parties and continue despite contingencies of remarriage, death, or changed financial conditions of either spouse. In re Alcorn, supra. In any event, when a party claims that obligations have been discharged in bankruptcy, the agreement must be analyzed to ascertain whether the agreement merely provides for a property settlement or whether the agreement embodies the legal obligation to support the other spouse, and the decisions in this context tend to find that maintenance and support was intended where the form of the payments more closely resembles a normal support arrangement. Thus, if the

obligation terminates upon the death or remarriage of the recipient spouse, the death of the obligee spouse, and if the obligation is payable in installments over a substantial period of time, courts are inclined to rule that maintenance and support, rather than a property settlement, was intended. *Annot.,* 74 A.L.R.2d 758 (1960) (and cases cited therein).

The task for the court is to ascertain the intention of the parties from the agreement, and in construing contracts, such as that incorporated into the decree *sub judice,* it is the duty of the court to place itself in the position of the contracting parties in order to comprehend the intentions of the parties. *E. g., J. M. Huber Corp. v. Denman,* 367 F.2d 104 (5th Cir. 1966); *Travelers Indemnity Co. v. Holman,* 330 F.2d 142 (5th Cir. 1964). This rule of construction applies irrespective of whether the contract is ambiguous or not. *Lawrence v. United States,* 378 F.2d 452 (5th Cir. 1967). Similarly, in order to ascertain whether the contract is ambiguous or not— as well as its meaning—a court must look beyond any detached language in the contract and, therefore, consider the circumstances surrounding its execution and all other relevant incidents bearing on the intent of the parties or their apparent object in contracting. *Adler v. Nicholas,* 381 F.2d 168 (5th Cir. 1967); *Ludwig Honold Manufacturing Co. v. Fletcher,* 405 F.2d 1123 (3d Cir. 1969); *In the Matter of Trigg,* Case No. B–74–774A (N.D.Ga. May 5, 1975) (Hill, J.). *See also, In re Wasden,* Bankruptcy No. 475–470 (S.D.Ga.1976). As a consequence, in the case of a written contract such as that incorporated into the divorce decree, all the attendant and surrounding circumstances can be proven, and if there is an ambiguity, fraud or mutual mistake, parol evidence may be admissible to explain it. However, parol evidence cannot be employed to add to, detract from, or vary the terms of the written instrument. Ga. Code Ann. §§ 20–704(1); 38–501 and 502. *See, e. g., R. C. Craig Ltd. v. Ships of the Sea, Inc.,* 401 F.Supp. 1051, 1058 (S.D.Ga.1975); *Molly Pitcher Canning Co. v. R. H. Smalling's Son's,* 129 Ga.App. 742, 200 S.E.2d 908

(1974). Despite the parol evidence rule, however, it is well settled that the mere choice of language of the parties or their fortuitous use of the word "alimony" or "property settlement" is not solely determinative of the character of the obligation, since the substance of the agreement should control over its form for the purpose of determining its dischargeability in bankruptcy. *Adler v. Nicholas, supra; Williams v. Department of Social and Health Services,* 529 F.2d 1264 (9th Cir. 1976); *Poolman v. Poolman,* 289 F.2d 332, 335 (8th Cir. 1961). *Cf. Pepper v. Litton,* 308 U.S. 295, 305–06, 60 S.Ct. 238, 84 L.Ed. 281 (1939).

The bankruptcy judge allowed the appellant-bankrupt, the appellee, and the attorney who had represented appellee during the divorce proceedings to testify as to the facts and circumstances which ultimately led to the execution of the agreement incorporated in the divorce decree. On the basis of testimony supplied by the appellee's attorney, the bankruptcy judge found as a matter of fact that at the time of the divorce, appellee required a sum of approximately $3,000 to $3,500 per month to support herself and the issue of her marriage to appellant, and that during the nineteen-month period of separation preceding the divorce, appellant had paid to plaintiff a sum in excess of $3,000 per month which plaintiff used solely for her support and maintenance. Similarly, on testimony by both the appellee and her attorney, the bankruptcy judge further found that the terms of the agreement, and particularly the amounts payable under paragraphs 2(a), 2(b), and 2(g) were determined with a view to providing for the reasonable support and maintenance of appellee on a monthly basis. However, despite the plain language of paragraph 2(b) itself designating the payments as "property settlement, and not alimony", the bankruptcy judge concluded that they arose as a substitute for alimony, support, and maintenance, although the method for making such payments was based primarily upon a desire of the parties, particularly the appellee, to take advantage of pertinent provisions of the Internal Rev-

enue Code relating to the favorable tax treatment accorded the recipient of lump sum property settlements payable in installments over a period of ten years or less *vis a vis* "alimony." Moreover, the bankruptcy judge further found that payments made during the parties' separation and the payments made pursuant to paragraphs 2(a) and (b) were made from appellant's income from his law practice, rather than from liquidation of certain substantial real estate holdings. Accordingly, the bankruptcy judge concluded that the payments in paragraphs 2(a) and (b) were in reality provision for appellee's support and maintenance despite their apparent formal attributes as installment payments of a property settlement for tax advantages, and that cash payments were not intended to constitute a division of marital property.

■ At the outset, we agree with the bankruptcy judge's conclusion that in determining the dischargeability of a given debt, we are not bound by the form of the transaction nor by the label given by the parties to payments owing under an arrangement settling their marital rights and obligations; on the contrary, it is the court's duty to ferret out the substance of the transaction. *See, e. g., Adler v. Nicholas,* 381 F.2d 168, 170 (5th Cir. 1967); *In re Nunnally,* 506 F.2d 1024 (5th Cir. 1975); *Westmore v. Markoe,* 196 U.S. 68, 25 S.Ct. 172, 49 L.Ed. 390 (1904); *In re Alcorn,* 162 F.Supp. 206 (N.D.Cal.1958); *Williams v. Department of Social and Health Services,* 529 F.2d 1264 (9th Cir. 1976). *Cf. Pepper v. Litton,* 308 U.S. 295, 305–06, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Poolman v. Poolman,* 289 F.2d 332, 335 (8th Cir. 1961). In other words, as one court has aptly described our concern herein:

> The real issue in this case is not . . . whether the award of the divorce decree was alimony or a property settlement, but rather whether the "property settlement" was really an award for the support and maintenance of [the] wife.

*Lyon v. Lyon,* 115 Utah 466, 206 P.2d 148, 150 (1949).

On the other hand, our correlative concern is to what extent this court may go, by consideration of evidence extrinsic to the document itself, in arguably deviating from the express terms of a "lump sum" settlement for federal income tax purposes and hold that the payments were for "alimony maintenance and support" for bankruptcy purposes, particularly when several courts have been reluctant to allow such payments to shed their formal tax disguise. *See Yarus v. Yarus,* 178 Cal.App.2d 190, 3 Cal. Rptr. 50 (1960); *Abrams v. Burg,* 327 N.E.2d 745 (Mass.Sup.Jud.Ct.1975). *See also, Adler v. Nicholas, supra.*

■ The task before the bankruptcy court was to construe the instant agreement. The bankruptcy judge correctly allowed the attorney who represented Mrs. Smith during the bankruptcy proceedings to testify concerning circumstances extrinsic to the agreement in order to aid in its construction of the agreement. Moreover, the bankruptcy judge properly allowed appellee to introduce several letters, and tax-planning memoranda which shed light on the attendant circumstances and the meaning of the agreement and the nature of the obligations created by paragraphs 2(a), (b), and (g). These documents taken together with the testimony of Mrs. Smith's divorce attorney showed that appellant had an income of approximately $200,000.00 per year, but that he and his family had not been required to pay any income tax on that amount because he had substantial real estate holdings which produced "tax shelter." In a memo dated July 3, 1973, from Mrs. Smith's attorney to another member of his firm, the attorney commented upon the rather unique tax situation and his desire that any payments to Mrs. Smith not have the effect of "converting the income of the family from sheltered income to unsheltered income in her hands" in the form of alimony, and therefore, that he had conceived of the notion of proposing "a lump sum settlement which [would] be paid to Mrs. Smith in monthly installments for a period of less than ten years which *would approximate her needs for alimony and child support* during that period of time."

(emphasis supplied). In a handwritten notation on the memo, it was stated that "we cannot transfer the shelters to Mrs. Smith" and another handwritten memo noted that in order to protect any payments from being treated as alimony and income to Mrs. Smith, it was not only necessary that such payments not be conditioned upon her death or remarriage, but further that such payments must "not [be] subject to change on the economic status of either spouse." Other documentary evidence introduced at the hearing showed a budget that Mrs. Smith had been requested to draw up prior to the divorce in order to negotiate the terms of the agreement which showed that her monthly needs were approximately $3,000 per month for maintenance and support of herself and the children without consideration of certain insurance costs. Also introduced was a memorandum prepared by a summer associate at the law firm, outlining the income tax treatment of periodic *vis a vis* installment payments of a lump sum, and recommendations as to any final agreement to be drafted in order to protect Mrs. Smith from having to pay income tax at least for the initial period of less than ten years. One letter emanating from an attorney reflects the very concern of the agreement, that is "to shelter the *alimony* which Ann might receive from George in order to avoid the payment of income taxes." (emphasis supplied). Moreover, the loosely described "minimal alimony" payments, that is, the $100 payment provided for in paragraph 2(g) were inserted in the agreement in the event that the tax precautions failed, so that Mrs. Smith could seek an upward judicial modification of these payments in the event she was required to pay taxes on her income received as the payments in paragraph 2(b).

The $25,000 payable in paragraph 2(a) in four installments arose out of Mrs. Smith's demand for $35,000.00 cash at the time of the divorce in order to cushion her during the transition period following the divorce. Appellant himself testified that he assumed that this lump sum might be utilized by Mrs. Smith to establish her own real estate business, or in other words, to assist her in developing her own means of support. The bankruptcy judge correctly allowed appellee's counsel to testify as to the circumstances surrounding the divorce in order to allow this court to put itself in the position of the contracting parties to ascertain the purpose of the agreement in order to construe the instant agreement. *See In the Matter of Trigg, supra.*

Mrs. Smith had the burden of proving that the obligations in paragraphs 2(a), (b), and (g) were in the nature of payments for alimony, support, and maintenance and were, therefore, not dischargeable in bankruptcy. Bankruptcy Rule 407. *In the Matter of Trigg, supra.* Appellee satisfied her burden of making a *prima facie* showing that although the payments in paragraph 2(b) were couched in the language of "installment payments of a lump sum property settlement" for federal income tax purposes, that the payments were, nevertheless, for alimony, support, or maintenance. Critical to our determination that Mrs. Smith satisfied her burden of making a *prima facie* showing as to nondischargeability are: (1) the fact that the $1,900.00 monthly payments were to continue throughout the entire agreement and after the initial nine-year period would become modifiable because of changed circumstances and contingent upon her subsequent death, remarriage, or cohabitation, although the identical payments were described differentially as installment payments of a lump sum in paragraph 2(b) and "alimony" in paragraph 2(g); (2) the budget and other extrinsic evidence indicating that approximately $3,000.00 per month was necessary to maintain Mrs. Smith and the issue of her marriage to appellant, taken together with the fact that during the initial nine years of the agreement appellee would receive $1,900.00 in installments, plus $1,000 per month in child support, plus $100 per month in "alimony" or a total of $3,000.00 per month; and (3) the letters, tax memoranda, and other documents indicating the overriding concern of appellee and her attorney that Mrs. Smith be maintained and supported in the manner to which she

had become accustomed during her marriage to appellant with the least possible tax burden to her or her former husband, in view of the family's overall tax and financial situation. Finally, since the appellee expressly assumed payments on the existing mortgage obligations on the family home, it is further evident that the payments received under the agreement were to some extent designed to discharge appellee's legal obligation to supply continued shelter to his former wife and family. *Cf. Poolman v. Poolman, supra* (undertaking to keep up installment payments on trust deed on home in which divorced wife and children were to live was liability for "maintenance or support of wife or child" and not dischargeable).

■ After Mrs. Smith made her *prima facie* showing that the payments in paragraphs 2(a), (b), and (g) were rooted in the legal obligation of Mr. Smith to provide continued support and maintenance, it was thereafter incumbent upon the bankrupt to prove that he was entitled to discharge. *In the Matter of Trigg, supra; In re KDI Corp.,* 477 F.2d 742, 747 (6th Cir. 1973); *Feldenstein v. Radio Distributing Co.,* 323 F.2d 892, 893 (6th Cir. 1963).

The attorney who had represented the bankrupt during the divorce proceedings did not testify at the hearing nor did the bankrupt himself introduce extrinsic evidence controverting that introduced by appellee showing that the principal concern of the agreement was to provide Mrs. Smith and the issue of her marriage with support in order to maintain them in their previous life style. However, the bankrupt himself testified, *inter alia,* over objection, that he never intended to give his wife any alimony and that his whole purpose was merely to terminate the marriage as quickly and with the least possible financial strain to him. To that end, he accordingly, stated that he sat down at his office on a Saturday alone and tried to realistically estimate and determine what the cash value of his various real estate holdings was in the event of liquidation at that time and that the $205,000.00 lump settlement figure in paragraph 2(b)

was arrived at in this manner. The bankruptcy judge apparently found appellant's testimony less credible than the well-documented position of appellee. Moreover, he testified that in view of the fact that his holdings were in the form of general and/or limited partnership interests and in view of the decline in the real estate market, he decided against transferring any of his interests outright to appellee, in order that he could swiftly dispose of the property at some point in the future. The bankrupt further testified that he wanted the privilege of discharging his entire obligation under paragraph 2(b) by commuting it to present value before the expiration of the nine-year period since he contemplated disposing of his real estate assets.

It cannot be gainsaid that the payments provided in paragraph 2(b), on their face, resembled deferred payments on a lump sum property settlement, in the sense that they were absolutely due and payable and that such obligations would not terminate upon the death of Mrs. Smith or her remarriage and were not subject to modification. Ordinarily, the payment of a continuing obligation after the wife's need for support terminates, strongly supports an intent to divide property and strongly refutes an argument that it is alimony. *See Adler v. Nicholas, supra.* Nevertheless, while Georgia law recognizes that the remarriage of the wife extinguishes the obligation to pay permanent alimony, applicable code provisions note that this general principle can be altered if "otherwise specified in the decree." Ga. Code Ann. § 30–209. Conversely, in some instances, the mere fact that payments will terminate on the wife's remarriage or death is not solely determinative that the payments constitute alimony, support, or maintenance, if the manifest intentions of the parties appear to the contrary. *Yarus v. Yarus,* 178 Cal.App.2d 190, 3 Cal.Rptr. 50 (1960). Moreover, in Georgia, unlike some other states, the right to receive alimony does not automatically cease on the husband's death, unless the parties intended or the decree so provides, *see, e. g., Veal v. Veal,* 226 Ga. 285, 174 S.E.2d 435 (1970); *Eastand v. Candler,* 226 Ga. 588, 176

S.E.2d 89 (1970), with the result that it is not inconsistent with the concept of "alimony and support" that Mr. Smith's obligations under paragraph 2(b) were not contingent on his survival or that he was required to maintain insurance payable in the amount of his unsatisfied obligations to his former wife under subparagraph (b) in the event of her prior death.

On the other hand, the ability of the husband to discharge his obligation under paragraph 2(b) in toto and to commute the remaining payments to present cash value are strongly indicative of a property settlement rather than of "alimony." *Abrams v. Burg, supra.*

The agreement in *Abrams v. Burg, supra,* however, is distinguishable from that *sub judice* in the sense that the husband therein could satisfy his *entire* obligation under the agreement by commutation thereof. In the instant case, on the other hand, after the expiration of the nine-year period in which the so-called "property settlement" might be satisfied, appellee remained under a continuing obligation to pay $1,900.00 per month, under paragraph 2(g), although the identical $1,900.00 monthly payments in paragraph 2(g) were expressly designated "alimony", were contingent upon the wife's death or remarriage, and were expressly made modifiable in accordance with the husband's changed financial status.

When viewed together, subparagraphs 2(b) and (g) make it apparent that the parties and the agreement contemplated payments to Mrs. Smith of $2,000.00 per month (excluding the child support payments) which were to some extent subject to modification by reasons of "minimal" and modifiable alimony payments in paragraphs 2(g), although the initial $1,900.00 monthly payments during the initial nine years of the agreement were not subject to defeasance on the contingency of her prior death or remarriage. While not the stereotypical form of alimony payments, the parties were clearly free under Georgia law to make such payments devoid of any contingencies in the initial stage of the agreement. After the initial nine years of the agreement, however, these identical payments of $1,900.00 per month plus $100.00 per month had the traditional earmarks of "alimony" in the sense that they were subject to the contingencies of death or remarriage of the wife and modifiable in accordance with the changed financial circumstances of the husband.

Appellant has cited several decisions for the proposition that in determining whether separation agreements provide for maintenance and support of the former wife, the plain words of the agreement cannot be disregarded simply because the form of the agreement of the choice of the language was to assure desired income tax consequences. *See Abrams v. Burg, supra; Yarus v. Yarus, supra.* We find, however, that the divorce agreements at issue in those decisions are to some extent distinguishable. In *Abrams v. Burg, supra,* the court expressly found significance "in the fact that the agreement is silent on the subject of support payments to the wife, while providing support payments for the minor children." 327 N.E.2d at 748. Although presuming that discharge of the obligation to support might have been involved in negotiations, the court concluded that the plain words of the agreement could not be disregarded because "all references to maintenance and support might have been excluded from the agreement to assure the desired income tax consequences." *Id.* In contrast, in the instant case, the inclusion of the provisions of subparagraph 2(g) make it evident that the parties contemplated support and maintenance of Mrs. Smith of approximately $2,000 per month which when added with the $1,000 per month child support not infortuitously totalled the amount of support which Mrs. Smith needed as evidenced by her budget, as well as the amount of support and maintenance which appellant had provided his wife during the terms of her separation. Similarly, the agreement in *Yarus v. Yarus, supra,* can be distinguished from that herein, in the sense that the agreement provided merely for the payment of installments of a lump sum over a six-year period, without the addition of numerous other payments of

identical amounts that were designated alternatively as "installments of a lump sum" or "alimony" depending upon the period of time in question.

 While we are not unmindful of the strictures of the parol evidence rule, we are not compelled to conclude, in view of the peculiar hybrid character of the instant agreement taken together with well-documented and essentially unrebutted extrinsic evidence of the circumstances surrounding the execution of the instant divorce agreement, that the payments in subparagraphs 2(a), (b) and (g) reflect the overriding concern and the intent of the parties that provision for Mrs. Smith's continued support and maintenance should be made, and as such, such obligations were not discharged in bankruptcy by reason of § 17(a)(7). In reaching this conclusion, we are cognizant as was the bankruptcy judge that bankruptcy courts are essentially courts of equity to be guided by equitable doctrines and principles, *see, e. g., Bank of Marin v. England,* 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966); *Maley v. Carroll,* 381 F.2d 147 (5th Cir. 1967), and in the exercise of our jurisdiction, we should avoid presumptively discharging the legal and moral obligations of the husband to support, in the absence of the clear intention of the parties and the Act to do otherwise. *See Wetmore v. Markoe, supra.*

Accordingly, for the reasons hereinabove expressed, the order of the bankruptcy judge entered July 26, 1976, is hereby AFFIRMED.

IT IS SO ORDERED.